IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05-10108-01-WEB |
| ) | |
| DAMION KLENK, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**Memorandum and Order**

This matter came before the court on October 17, 2005, for an evidentiary hearing on the defendant's motion to suppress evidence. The court orally denied the motion at the conclusion of the hearing. The court also orally revoked the Order of Release previously entered in this case and remanded the defendant to custody pending the trial of this matter. This written memorandum will supplement the court's oral ruling.

I. *Facts.*

The evidence presented at the suppression hearing showed the following facts. On or about September 25, 2001, the Graves-Baird Funeral Home in Sedan, Kansas, was destroyed by fire. Shortly thereafter, Special Agent Douglas Monty of the Wichita office of the Bureau of Alcohol, Tobacco and Firearms received a call from Kansas Fire Marshal Investigator Kevin Kitterman asking for assistance in determining the origin and cause of the fire. Monty traveled to Sedan to meet with Kitterman and to examine the fire scene. The two officers began a joint investigation.

The name of the defendant, Damion Klenk, came up during the officers' initial investigation.

Kitterman and Monty contacted Klenk, and Klenk agreed to meet with them. On October 5, 2001, the defendant met with the officers at a conference room at the Chautauqua County Courthouse in Sedan. The officers asked Klenk if he knew anything about the fire. He said he did not. They asked about his whereabouts on the night of the fire and the defendant provided them with an alibi. According to Agent Monty, the officers did not know at that point what, if any, role the defendant may have had in the fire. Monty testified that Klenk was not given *Miranda* warnings prior to this meeting because he was not in custody. Klenk left the courthouse after speaking with the officers for a while.

The investigation into the fire continued on and off for several years. In the course of the investigation, officers Monty and Kitterman received information from witnesses who said that the defendant told them he had set the fire.

On May 20, 2005, agents Monty and Kitterman went to Cherokee, Kansas, and found the defendant in the front yard of his sister's house. They asked if he remembered them; he said he did. They asked if he would come talk to them about the fire, and the defendant agreed to do so. The defendant was given a choice of driving himself or riding with the agents to the Pittsburg (Kansas) Police Department, which was about 10-15 miles from Cherokee. The defendant chose to ride with the officers. The three men went to an interview room at the police department. The defendant sat in a chair in the interview room. He was not restrained. One of the officers said to the defendant that they first needed to advise him of constitutional rights. Agent Monty produced an ATF "Waiver of Right to Remain Silent and of Right to Advice of Counsel" form. Monty went over with the defendant each of the rights listed on the form. The form explained that defendant had the right to remain silent, that anything he said could be used against him in court, that he had the right to talk to a lawyer before questioning and to have a lawyer present, and that

if he could not afford a lawyer one would be appointed for him by the court. It also explained that he had the right to stop the questioning at any time. After Monty read each of these rights to the defendant, he asked if the defendant understood them, and the defendant said he did. The defendant read each of the rights on the form and appeared to understand them. He did not appear to be under the influence of alcohol or drugs, nor did he have any difficulty communicating with the officers. After reviewing the rights on the form, Monty reviewed a waiver provision at the bottom of the form. The defendant read the waiver, said he understood it, and then signed it. The waiver stated: "I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have made [sic] to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my rights, and I am willing to make a statement and answer questions." Govt. Exh. 1.

     After the defendant signed the waiver, agent Kitterman said they needed to ask him about the fire and to get his side of the story. He said they had evidence of his involvement and that a number of witnesses had said the defendant claimed to have started the fire. The officers talked at some point about the potential for prison time if the defendant had started the fire. They also said that if he cooperated with them, they would inform the prosecutor of that fact, but they could not make any promises about what would happen to him. After a short period of questioning, the defendant proceeded to tell the officers that he had started the fire. He said it had happened during a period in his life when he was mad at everyone for no reason. The defendant appeared calm as he recounted what happened. Agent Monty's impression was that the defendant was glad to get the matter off of his chest. The defendant's statements about how the fire was started were consistent with the officer's conclusions about the origin and cause of the fire. At some point in the interview, the defendant expressed concern about being prosecuted in Chautauqua

3

County because he had a criminal history there and did not think he could get a fair trial. When the defendant said he was hopeful the matter could be prosecuted in federal court, the officers said they would see what they could do but could not make any promises.

After talking with the defendant for about twenty to thirty minutes, the officers asked the defendant if they could record his statement. He said they could. Agent Monty retrieved a tape recorder from his vehicle and recorded the defendant's ensuing statement. In the recorded statement, the defendant said, among other things, that he had entered the funeral home on the night of the fire and doused a wicker couch or chair full of newspaper with rubbing alcohol and then set it on fire. He said that after the fire he proceeded to a friend's house and told the friend what had happened. He said he could not recall telling others about the fire, but conceded he might have bragged to someone else about it when he was drunk. Near the conclusion of the taped interview, the following exchange too place:

> [Kitterman]: The other thing I, I want to make clear on, on the record is that we told you that we would take your cooperation and let the prosecutors know that. We haven't made you any promises, threats, anything as to where this case might be prosecuted, right?
>
> [Defendant]: Right.
>
> [Kitterman]: We will, as we, I had told you on tape, we will let the prosecutors know that you've been cooperative. You've been a stand up guy and, and doin' the right thing, just tryin' to get his life together, and, and that's what we told you we would do.
>
> [Defendant]: Right.
>
> [Monty]: And that's what we will do. Is there anything we haven't asked you about regarding the fire that you think is important?
>
> [Defendant]: No, not that I can think of. I think that pretty much covers the fire and what happened. And there was, there was, like I said, there

4

> was no reason for it. I mean it was just ... it was just stupid. It just happened.
>
> [Monty]: Young kid making a stupid mistake.
>
> [Defendant]: Me being myself when I was younger.

Def. Exh. 2A at 10-11.

II. *Summary of Arguments*.

Defendant argues that his statements during the May 20, 2005, interrogation were not voluntary, but were the result of threats and promises by the officers. He alleges that the officers told him they had numerous witnesses against him and that the only question was whether he would be doing "hard time" in a state prison or "easy time" in a federal prison. He claims the officers promised that he would be prosecuted in federal court rather than state court if he confessed, and he alleges that he made incriminating statements only because of the officers' threats about what he was facing and their promises of leniency if he confessed.

The Government contends there were no threats or promises as to where the case would be prosecuted. It argues that the totality of circumstances shows that the defendant knowingly waived his *Miranda* rights and his statements to the officers were voluntary.

III. *Discussion*.

The court first finds that the defendant validly waived his *Miranda* rights in connection with the May 20, 2005, interrogation. When a suspect has been advised of his *Miranda* rights, he may validly waive them provided the waiver is made voluntarily, knowingly, and intelligently. *United States v. Glover*, 104 F.3d 1570, 1582 (10th Cir. 1997). There are two requirements for a valid waiver: First, the

relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  *Id*. (*Citing Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  In making this determination, the court must evaluate the particular facts and circumstances surrounding the waiver, including the background, experience, and conduct of the accused.  *Glover*, 104 F.3d at 1582 (*citing Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  Under the evidence presented, there is no question that the defendant was not coerced into waiving his rights, but that he did so voluntarily as the result of a free and deliberate choice.  Furthermore, the evidence shows the defendant understood the nature of his rights and the consequences of abandoning them.  The officers used no improper coercion or intimidation to induce the defendant to waive his rights.  In sum, the waiver of *Miranda* rights was valid.

Notwithstanding this valid waiver, defendant contends that this incriminating statements to the officers were involuntarily.  *See United States v. Erekson*, 70 F.3d 1153, 1157 (10th Cir. 1995) (even if defendant's *Miranda* rights were not violated, his statements would be inadmissible if they were made involuntarily).  A determination of voluntariness is based on the totality of the circumstances.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).  The court must examine numerous factors including the characteristics of the suspect, such as his age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his rights, the length of the detention and the interrogation, and the use or threat of physical force.  *See United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993).  "A defendant's confession is involuntary if the government's conduct causes the defendant's will to be overborne and his capacity for self-determination critically impaired." *United States*

6

*v. McCullah*, 76 F.3d 1087, 1101 (10th Cir.1996). "In determining whether the defendant's will was overborne in a particular case, the court examines the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation. *Id*.

After considering the totality of the circumstances, the court concludes that the defendant's statements to the officers were made voluntarily. The evidence shows that the defendant is a competent adult who understood the circumstances and the consequences of talking to the officers. He was informed of his constitutional rights by the officers and made a knowing, intelligent, and voluntary decision to waive his rights and give a statement. Although the defendant was in custody at the time of the statement, he was not subject to physical intimidation or mistreatment. The interrogation by the officers was not extended in duration; it lasted a total of about 55 minutes -- a period that included an explanation of the defendant's *Miranda* rights, a break, and a repetition of parts of the interview after a tape recorder was obtained. The officers were polite to the defendant throughout their meeting. The defendant chose to make a statement very shortly after the interrogation began. The defendant's answers to the officers' questions were responsive and indicated that he completely understood what was going on. His statements also indicated at one point that he had prior experience with law enforcement. There is no evidence that the defendant was unusually susceptible to coercion from law enforcement authorities. The circumstances of the interview show that the defendant was not improperly pressured into making a statement but that he decided to do so of his own free will.

The defendant argues that the officers made improper threats or promises in the course of the interrogation. Incriminating statements obtained by government acts, threats, or promises that permit a defendant's will to be overborne violate the Fifth Amendment and are inadmissible. *Malloy v. Hogan*, 378

7

U.S. 1, 7 (1964). But the evidence here does not support defendant's contention that the officers engaged in such improper tactics. The officers made clear to the defendant that they could make no promises about the treatment he would receive if he made a statement, only that they would inform the prosecutor of his cooperation. They also said in response to his expressed preference to be prosecuted in federal court that they would "see what they could do" but again could make no promises. Such statements do not constitute promises of leniency that would undermine the voluntariness of the defendant's statement. *See United States v. Nguyen*, 155 F.3d 1219, 1223 (10th Cir. 1998) (a statement to inform the prosecutor of a defendant's cooperation without any other indications of coercion does not constitute a promise of leniency); *United States v. Roman-Zarate*, 115 F.3d 778, 783 (10th Cir. 1997) (agreeing to make extent of cooperation known to the prosecuting attorneys does not taint ensuing statements as involuntary). Nor does the fact that the officers recounted the evidence against the defendant during the interrogation or that they might have embellished somewhat the strength of that evidence. *Cf. Clanton v. Cooper*, 129 F.3d 1147, 1158 (10th Cir. 1997) ("It is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him."). There is no evidence that any express or implied promises of leniency were made to the defendant, or that any of the officers' representations were of a coercive nature that caused his free will to be overborne. The evidence shows that the defendant's decision to make a statement resulted not from coercion by the officers, but from the defendant's voluntary and knowing decision to cooperate in the hope of obtaining more lenient treatment.

  In sum, under the totality of the circumstances the court finds that the defendant's statements during the May 20, 2005 interrogation were voluntarily.

    IV. *Revocation of Order of Release*.

At the conclusion of the suppression hearing, the court reviewed the order of release previously entered in this case (Doc. 15) as well as the order modifying the defendant's conditions of release pending trial (Doc. 20). After reviewing the conditions, as well as the risk factors indicating that the defendant is a possible flight risk and danger to the community -- such as the fact the defendant is charged with arson; the weight of the evidence against him; his prior criminal history; his lack of a stable address; and his history of drug and alcohol problems -- the court stated its intention to impose additional conditions of release. In an attempt to meet those conditions, the defendant and his counsel met with the Probation Officer. In the course of that meeting, and with his counsel present, the defendant informed the Probation Officer that he had used marijuana approximately a week earlier. The Probation Officer relayed this information to the court, and the court then reconvened the hearing on the defendant's release status. At the hearing, defense counsel conceded that the defendant had in fact admitted to having used marijuana while released on bond. Based on that uncontested fact, as well as all of the other circumstances, the court determined that the defendant had violated the conditions of release previously imposed by the court. The court further determined that no condition or combination of conditions of release would reasonably assure the safety of the community and the defendant's appearance as required. Accordingly, the court revoked the prior order of release and ordered that the defendant be detained pending trial.

V. *Conclusion.*

Defendant's Motion to Suppress Evidence (Doc. 17) is DENIED.

The Order of Release previously entered in the case is hereby REVOKED, and it is Ordered that the defendant be detained pending trial in this case. The defendant is hereby committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from

9

persons awaiting or serving sentences or being held in custody pending appeal. The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which the defendant is confined shall deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

       IT IS SO ORDERED this ___19th___ Day of October, 2005, at Wichita, Kansas.

                                        s/Wesley E. Brown
                                        Wesley E. Brown
                                        U.S. Senior District Judge